Antoni Nowakowski, Appellee, v. The G. H. Hammond Company, Appellant.

Gen. No. 14,952.

CONTRIBUTORY NEGLIGENCE—*when bars recovery.* *Held*, that the plaintiff in this case, who was injured while working as a steam fitter's helper at the plant of the defendant by stepping upon the cover of a blow tank containing steam, hot water and grease, which cover went down under his weight and he was scalded, was guilty of such contributory negligence as a matter of law which barred a recovery.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Reversed with finding of fact. Opinon filed May 3, 1910.

Statement by the Court. This appeal is from a judgment of the Superior Court in favor of Antoni Nowakowski, plaintiff, and against the appellant, G. H. Hammond Company, defendant, in an action for damages for personal injuries sustained by him on July 17, 1907, while working for defendant as a steam fitter's helper at its plant in Chicago. Plaintiff stepped upon the cover of a blow tank containing steam, hot water and grease. The cover went down under his weight and he was scalded.

The defendant company was engaged in the business of packing meats. In connection with that business it manufactured various by-products; and in the conduct of such business it had on its premises a catch basin, about four yards wide and one hundred yards long, into which was collected from various buildings of defendant's plant grease and water. As the grease collected on the surface of the water it was skimmed off and put into barrels and trucked up to a small platform at the west end of the catch basin, and was there dumped into a tank called a blow tank. This tank was made of iron about three-eighths of an inch in thickness. It was cylindrical in shape and about six feet six inches long, and three feet in diameter. It was set

in the ground on one end so that about two feet of it extended above the ground.

The upper end of the tank was oval in shape. In the east center part of the top of the tank there was an opening elliptical in shape about ten inches wide and sixteen inches long. An iron cover weighing about 45 pounds was provided and fitted in the opening from the under side of it in such a manner that when the tank contained a quantity of grease, and steam was forced into the tank, the cover was forced up into and against the opening. By causing a sufficient pressure of steam in the tank the grease was forced up through a pipe three inches in diameter to the third floor of a building alongside of the tank. When there was no pressure of steam in the tank the cover was ordinarily held in place by two clasps or crabs each of which was in the shape of an arch. The points of the arch rested on the top of the tank at the edge of the opening, spanning the opening. From the center of each arch a bolt extended down to and fastened into the center of each end of the cover. There was also attached to the cover a chain, the other end of which being fastened to a discharge pipe three feet above the tank, prevented the cover from falling to the bottom of the tank. Over and around the blow tank was a platform about six feet square. The plaintiff proved by his evidence that the oval top of the tank was, on July 17, 1907, about four inches above the platform, and that there was no hopper around the opening into the tank. The defendant, on the other hand, shows by its evidence that the oval top of the tank on that date was below the platform and that there was a hopper constructed in the platform around the opening into the tank about twenty inches square and eight inches deep and the top of it was about six inches above the platform. The hopper was constructed and used for the purpose of pouring the grease into the blow tank from barrels.

Upon a requisition made and an order given thereon

in accordance with the regulations in force in the defendant's establishment, the plaintiff's witness Quinlan and the plaintiff, who was his helper, in the morning of July 17, 1907, put a pop valve, as it is called, on the blow tank. They adjusted the valve to a pressure of 45 pounds. Quinlan did most of the work, the plaintiff standing around holding the tools and looking on. They finished this work between ten and eleven o'clock and went to another job near there and worked until noon. They then went to their luncheon. As they were returning to their work after luncheon, Christie, whose duty it was to skim the grease off the catch basin and put it in the blow tank, was at the tank and Quinlan and the plaintiff stopped there, as they claim, because Christie said to them "that thing ain't working perfectly." Quinlan asked the plaintiff to go with him to the blow tank. Christie told them that there was steam in the tank, and Quinlan saw Christie tap with his wrench on the cover, and it sounded as if the tank were full. He also saw that the cover was held up, although there was no crab on it. Quinlan told Christie that he would have to send in a report about it, and ordered the plaintiff to "come on," at the same time starting up the incline leading from the platform to the walk along the side of the building adjoining the tank. The plaintiff says in his testimony that he started to follow Quinlan and "happened to walk into that manhole there, and when I stepped into that manhole my foot slipped on the cover and I got in there and got scalded."

Christie gives a different account of what took place at the time of the accident. This we shall refer to in the opinion and it need not be stated here.

Frank M. Cox and R. J. Fellingham, for appellant.

White, Mabie & Conkey, for appellee; Lemuel N. Ackley, of counsel.

MR. JUSTICE SMITH delivered the opinion of the court.

The evidence in the record presents sharp controversies upon two questions: first, whether the oval end of the blow tank projected about four inches above the platform around it at the time of the injury, July 17, 1907, as claimed by the plaintiff's witnesses, or whether the upper end of the tank was below the platform, and there was a hopper leading into the hole in the tank and extending five or six inches above the platform, as represented by the photograph offered in evidence, and testified to by the defendant's witnesses; second, did the plaintiff "happen to walk into that manhole," as he testifies, or, did the plaintiff say to Christie as he was standing there pushing on the cover with his wrench in order to let steam escape from the tank, "I will fix it," and take off the only crab that loosely held the cover in place, and press down with his foot on the cover, and although warned to get away by Christie, put his whole weight on the cover which went down under him, as Christie testifies?

A large part of the testimony on both sides of the case is directed to the establishment of the respective contentions of the parties as to the physical situation at the tank as stated above. Plaintiff offered the testimony of Donovan, Quinlan, Smith, Barber, Rogers and of himself, to establish his contention that the tank projected above the platform, and that there was no hopper there at the time of plaintiff's injury. The defendant offered the testimony of Mulree, Florrie, Watt, Custer, Christie, Phillips, Schurtz, Colsell, Swanson, Vorva and Shearer, and a photograph of the place showing the platform, hopper, pipes and situation around the blow tank, to show that on the day of the accident the top of the tank was covered as shown in the photograph, and that the hopper was there and had been there ever since the platform was built.

Upon a consideration of all the evidence on this subject, and the character and experience of the wit-

nesses, together with their opportunities to observe and know the physical situation in regard to which they testified, we are of the opinion that the tank platform and approaches thereto were on the day of the accident in the condition shown by the witnesses for the defendant and that the hopper was there and projected above the platform about six inches. This, we think, is shown by the manifest weight of the evidence. We think the construction of the platform and hopper as shown by the evidence for the defendant is reasonable and far better adapted to the use which was made of them than the construction shown by the evidence for the plaintiff.

In our opinion, however, it can make little difference which theory of construction is adopted in the solution of the questions of contributory negligence and of negligence of the defendant upon the evidence in the record. It is clear from plaintiff's and Quinlan's testimony and the testimony of Christie that the plaintiff knew that there was steam and grease in the tank, and that he stepped upon the tank cover unnecessarily and carelessly with knowledge of the danger in so doing if the cover should go down. If the construction of the platform was around the tank leaving the oval shaped end projecting above the platform four inches according to the contention of the plaintiff, the lid or cover of the tank was evidently not intended to be a place to step upon for any purpose; and it was as clearly contributory negligence for the plaintiff to step upon the cover so elevated above the platform with the knowledge that the tank was full of grease and steam, as it would be for him to step into the hopper with the same knowledge.

There can be no doubt on the evidence that the plaintiff had full knowledge of the existence of the tank and the use of the cover. Quinlan's testimony, as well as his own, shows that during the time they were there putting on the pop valve the plaintiff stood on the platform holding the tools and watching the work. Quin-

lan tested and set the pop valve after he had put it on to blow off at 45 pounds pressure. In order to do this it was necessary to put the lid of the tank in place and turn on the steam. This was done, according to the evidence, while the plaintiff was there. The plaintiff testified that when they went back to the tank after their noon luncheon, Quinlan "went on one side and I went on the other side of the tank. Charley (Quinlan) opened a small valve there. When he was doing it he said 'come on, let us go; we have nothing to do with this.' And when I started I happened to walk into that manhole there, and when I stepped into that manhole, my foot slipped on the cover and I got in there and got scalded, and was all soaking wet, and grease and steam and all kinds of stuff were coming out together. I went down above my ankle there. When I was standing at the tank I was pretty close to the manhole there, not very far from there. I was standing watching Charley what he was doing, because there was no room there where he was and I went around the other side. There was no room because there was no platform there wide enough, and I didn't want to stand too close to him whenever he cut out the steam, so as not to get scalded, so I went over on the other side."

The evidence shows that plaintiff and Quinlan and Christie were standing around the top of the tank within a few feet of each other, and it is impossible that plaintiff did not hear the conversation between Christie and Quinlan with reference to steam being in the tank and Christie's desire to get it out of the tank. Quinlan opened a valve with the remark "that will relieve it." Plaintiff says he saw Quinlan open this valve. This would necessarily relieve the pressure on the lid of the tank, and yet after this was done plaintiff stepped upon the lid which was in plain view, and occupied only a small section of the head of the tank.

We think the plaintiff was guilty of contributory negligence, and that he cannot recover.

Campe v. Chicago City Ry. Co., 155 Ill. App. 539.

This conclusion disposes of the case. It is therefore unnecessary to consider the other questions presented by the assignment of errors and in arguments of counsel. The judgment is reversed with a finding of fact.

*Reversed with finding of fact.*